Good morning, sir. May it please the Court, my name is John Erickson. I represent the appellate in this matter, Mr. Michael Evans. By way of factual background, I will provide what I understand to be the undisputed facts in this case very briefly so that those in the gallery might understand the case better, as well as the Court, for a refresher, if you will. Mr. Evans was arrested and brought to the Multnomah County Detention Center, and during the booking process, he had his arms, hands placed on a table in front of him, his legs spread behind him, and Deputy Hathaway, standing next to him, began to ask him questions as he moved through the booking process, as he would with any other arrestee, asking him to remove his shoes. He examined his shoes, gave him his shoes back, asked him to put back on his shoes, these sorts of things. When Deputy Hathaway got to the point of looking at the appellant's inventory of items that were seized from him in the arrest, the appellant noticed that there were weapons missing. And he did not want to sign that inventory because he said, my weapons are missing. I'm not going to sign this. I likely won't get them back if they're not here. The deputy said, then I'm going to go ahead and we're going to fingerprint you. He said, I'm not going to put my fingerprints on this. The deputy said, you will put your fingerprints on this. He said, if you want my fingerprints, you're going to have to get them. At this point, the deputy became physical, pushed him into the counter, grabbed his right hand, and was about to take his fingerprints against his will when my client pulled back his right arm. Now, this is a point of contention, but as he pulled back his right arm in resisting to give his fingerprints, Deputy Hathaway at this point claims that the appellant, my client, hit him in the nose, causing him to bleed. At this point, he's in contention, as the facts later point out as we go through this case. But in any case, Deputy Hathaway then announces, he just hit me in the nose, whereupon all of the other deputy sheriffs and city police officers that are in the booking area begin a melee, if you will. Deputy Hathaway takes the client down to the ground. On his way to the ground, knees him two or three times in the side and torso. Another deputy comes around. And as my client goes down, in an effort to protect himself, covers his face, as you or I might. And he falls to the ground on his stomach, his hands covering his face. And the officers then begin to shout at him, give us your hands. At this point, my client has no idea why he's being attacked, other than the fact that he refused to give his fingerprint on an inventory that doesn't have the weapons which were taken from him. He doesn't recognize that everyone in the office believes that he just assaulted a police officer. He's trying to protect himself, as he has a right to do. As he's trying to protect himself, other officers come around, knee him, kick him, punch him in the head and body, as the video which is in the exhibit show. And then in the back is Monoma County's Sergeant Gorin, who is watching on a televised screen and sees what one officer claims to be a green blob, the deputy's green uniforms. It's hard to even make out where my client is at this point. One officer says, I saw a leg. Another one says, I couldn't see any arms, but I saw a hand, because all of the deputies and police officers were on him at this time. In fact, there's one point where it says in the record that one of the officers who weighs in at 270 pounds, 6'4", has his knee in his upper back. While his knee is in my client's upper back, the other officer has his knee in his lower back. My client, trying to protect himself, he says, give me your arms. Hard to believe my client can't get his arms out for the 270-pound guy on his back. While this is going on again, Sergeant Gorin comes around. She looks at him, realizes that she needs to get control of this situation. She calls for another officer to bring an X-26 taser. She takes control of an X-26 taser. She gets down on her knee, and she says, you will comply. My client, arguably still struggling, maybe even trying to comply by getting his arms out, can't do so. At this point, Sergeant Gorin turns on the taser, an ambidextrous switch on both sides. She turns it on, and a laser points directly into my client's eye for approximately 15 seconds, whereupon she says, you will comply. At this point, the appellee's suggestion is that the officer should suggest that my client become still and compliant. These are the facts, Your Honor. What acting school did you go to? I did take some theater in high school. I mean, I think it's important for lawyers to go to acting school. In a case. You just said these are the facts, and you used the word laser, and that is one of my favorite words. You said light. They call it a light, and then you just said laser. And I've looked through this record to try to figure out whether we can really know that there was a laser as the pointer on the taser. It's not the word that the judge uses. Judge Kristin, in the motions in Limini, there is actually exacting language that talks about this, and I can cite you to it. Well, there's assertions back and forth in the motions, and, you know, the terminology that the judges use, your side uses laser and their side uses light, and the judge used both, but although not in her order. But I'm looking for evidence, some testimony where somebody explained that that thing's a laser. There is a diagram in evidence, which is Exhibit No. 34 or 35, which I recently sent to the court, which is a color picture of the laser itself, of the taser, excuse me, the X26 taser, and it specifically depicts the light which illuminates from it as a laser pointer. Okay. How recently? You just sent it, and it's – forgive me. That's Exhibit 34 or 35 at trial? Yes, Your Honor. I'll find it. All right. Thank you. And that's going to use the word laser? Yes, Your Honor. All right. Thank you. You're welcome. Was there medical evidence about the damage to the plaintiff's eye? There was no evidence, Your Honor, but appellant will contest that there does not need to be any damage to the eye for the battery to exist, only an offensive contact. In this case, there was an offensive contact. My client did not want to be hit in the eye with a laser. He testifies and tells that he's familiar with lasers. He understands the taser, what it does, and it's an offensive contact to him. And that's all that it needs to be is a voluntary offensive contact that is inexcusable. And in this case, my client argues that it was inexcusable. Could I just ask you one more thing? I think there's no dispute that she shined it in his eye. That's at Excerpt 74. And he testified that it injured his eye in response to Judge Goodwin's question. I guess there's no medical testimony about that. But you said in your introduction that it was 15 seconds. Does that come through your client's testimony that it was 15 seconds? It's actually at trial, Your Honor, where if you take a look at the video itself. I've watched it. You can see for how long the laser is actually pointed, and you can use the timer on the top of the video to count down those 15 seconds. That's different. My question really is how long it's exposed to his eye, because it seems to me he would close his eye if there's a laser, a very, very bright light pointing into his eye. So at trial, I've watched the video. And then in addition to that, just to answer my question or to sort of focus my question, the only other testimony is of your client about how long his eye was exposed? That's correct. Okay. Because the 15 seconds itself is the laser being pointed. We don't know exactly. And we can't see in the video whether my client's eye is open or closed. Yeah, yeah. All right. So I think you've answered my question about that point, except that I just have one more, and that is, anywhere in the record, does the district court judge rule on battery by laser or just by taser? Just by taser. There's no dispute your client wasn't tased, right? He was not tased. In fact, we don't know if he could be tased. You know, this is fascinating because Sergeant Gordon, who is a sergeant in the Menomah County Sheriff's Department, can't even remember whether or not the taser had its cartridge in it or not. And there she is. Why does that matter? There's all this testimony I'm concerned about whether it had its cartridge in it. The laser light was working. I can see that on the video. And your claim is battery by laser, not taser, right? Yes, ma'am. Okay. Yeah, my only effort in pointing that out to you is it's somewhat disconcerting that the sergeant doesn't know whether or not the weapon that she is threatening to use is actually loaded or not. It worked. Her threat worked, right? He quit wriggling around. That's the argument. Yeah. Okay. And so I'd like to focus a little bit more on that argument and talk about some of the things that revolve around it in an effort to point out some of the strengths that are there. As Judge Christen pointed out, this issue was discussed at the trial court level, specifically in the excerpt of Rev. 148 through 152. Judge Brown briefly discusses the issue with a Mr. Madcor, who is an attorney for Monoa County. And at the conclusion of the colloquy, however, they don't actually get to a conclusion as to whether or not this is battery by laser. It's sort of brushed aside, which is why we want to reemphasize the fact that there was no particular ruling on it. At some point, Judge Brown says, well, okay then, was it then? Even if it was a battery, she kind of moves away from that and says, was there some sort of privilege to utilize it without ever resolving that issue? But ultimately, the issue is dismissed at the summary judgment stage, which is why we think it should be reversed and brought back to look at and actually examine a ruling made thereupon. In sum, with respect to that, I just want to point out that it was Sergeant Gorton's intended use of the laser, again, not the taser, that constitutes what we consider the battery pro se. And the act of shining the laser into the appellant's eye was done with the intent to cause, again, the offensive contact. More specifically, Sergeant Gorton intended to make the unwanted contact to the appellant's eye with the laser, which she did. And there's no argument with respect or opposite to that. That is to say, appellees don't argue otherwise. But notwithstanding that, and just so it doesn't go by the wayside, I want to point out that Mr. Madcore then argued that the use of the laser was privileged. And I don't think that it was. In fact, the appellant disagrees wholeheartedly that it was not. In the trial court's Exhibit No. 47, which you'll see, Your Honor, is a still image of the actual laser being pointed to the eye, it's clear that there was no need to use the laser for what Mr. Madcore considers a need to secure the facility. Again, at this point, the officers testify there's a green blob on the floor. It's hard to recognize where my client is. But Mr. Madcore suggests that there was a need to secure the facility, which makes the use of the laser and the threatening of the taser necessary to secure the facility. But again, as you'll note, at the time of the laser's use, the appellant was pinned down by a number of officers, he was bleeding from the head and face, he was unquestionably what I call contained and controlled at the time. So in sum with respect to this issue, two points. Because Sergeant Gorton's voluntary act was intended to cause an offensive contact, which we believe it did, the act constitutes battery per se under Oregon law, and because the offensive contact was not entitled to immunity, the appellant contends to district court's dismissal ultimately of the battery claim when it was unauthorized with respect to Sergeant Gorton's use, again, of the laser and should be reversed. I'd like to ask out of the five issues. Is there anything in the record that shows us that Sergeant Gorton had any reason to think that shining a laser in someone's eye might be damaging? There is testimony as to whether or not Sergeant Gorton ever received training specifically advising her not to shine a laser in, in this case, a suspect's or an arrestee's eyes. She says that she never received training. She didn't know one way or another. But we know, and through the record, that the taser itself, the X26, if you turn it upside down, there's a sticker on the bottom that says, warning, do not shine the laser of this device directly into the eyes of another. We know, like you and I know, or did the jury know? Is that in evidence, anyway? It is in evidence, Your Honor. Okay. So the trial court didn't reach the question of justification on this issue, right? Not that I'm aware, Your Honor. Are you suggesting we would reach it here, or would we remand? We should be remanded, Your Honor. Thank you. Do you want to save some time? I do, Your Honor. If I may save the rest of my time penning your questions, I'll sit down until rebuttal. Thank you. Thank you. Good morning. May it please the Court. I'm Carlos Calandriello on behalf of Appellees Multnomah County, Gorton, Griffith, Hathaway, and Sheriff Giusto. With me at counsel table is Harry Auerbach. He's counsel for the City of Portland and Officer Ryan Albertson. With the Court's permission, I'll use 13 minutes of the allotted 15 minutes with Mr. Auerbach using the balance of the time. I'll jump right into it. The Court got it absolutely right, both at the summary judgment stage and with its rulings made at trial before the case went to the jury. The recitation of the facts by appellant's counsel was, while very convincing, not a recitation of the facts that appellees buy into. We dispute that the taser was shined in Mr. Evans' eye for 15 seconds. The only evidence in the record before the trial court at the summary judgment stage on the length of time that the laser was shined into Mr. Evans' eye was, aside from the video, of course, Sergeant Gorton's deposition testimony where she was specifically asked, did you shine it in his eye and how long? And she said, briefly. That is the sum total of the evidence concerning the time that the laser was in the eye. One of the issues that I'd like to address here is the issue of intent. There seems to be some question about what is the intent that's necessary to prove a battery in Oregon. I submit to you that Oregon is a double intent state, meaning there has to be an intent to commit an act and then the act has to be committed with the intent to cause harm. Now, admittedly, harm doesn't have to be physical injury, the cases tell us, but that double intent is set out in the case of Cook v. Kinsua Pine Mills, an Oregon Supreme Court case from 1956, I believe. Still in use today, still sets the standard for the intent that is necessary to commit a battery. On the facts present before the court at summary judgment, there was nothing to indicate that Sergeant Gorton intended a harmful contact. She did not intend anything other than to get appellant's attention. That was the purpose of the taser. That was the purpose of the laser. The laser was shined near his eye or in his eye briefly, as she testified, for the very purpose of getting his attention so that he would stop. In fact, as the court pointed out, he did stop practically immediately. There's nothing that indicates that Sergeant Gorton intended to use the laser to hurt him or cause offense. And as the court also pointed out, there's nothing in the record at the summary judgment stage that would lead the court to conclude that she knew what the laser would do, that she knew whether it was even a laser. I'd point out that Sergeant Gorton's deposition testimony when they covered this point, she was asked by plaintiff's counsel, is it a laser? And she says it's a red light. And he asked, does it fan out? Does it spread? And she says, well, it's a dot. Counsel for plaintiff clearly believed it was a laser. She used the term aiming light. There's nothing in the record to suggest she knows it's a laser, that she knows it can be harmful, admittedly. Wasn't that part of her job? Excuse me, Your Honor? Wasn't that part of her job to know? I mean, you'd pick up a revolver, and you'd pull the trigger, and you'd fire. I didn't know that was a gun. The answer to your question is yes, it is part of her job. She should know this, Your Honor, absolutely. They're trained in taser usage. As soon as you're hired, if you're going to carry a taser, you must be trained on it. They teach you the parts of the taser, how to deploy the taser, the effects of the taser. They get tased themselves. So yes, Your Honor, she should know that. Now, for purposes of summary judgment in the intent element, there's nothing indicates that she does know that. And that really is a key point, Your Honor, because she may be negligent in her use of the taser. She may be reckless in her use of the taser. But the point that the trial court is trying to determine is whether she intends this harmful contact. Well, I mean, isn't there a presumption that you intend the natural consequences of your acts? Yes. There is a presumption, Your Honor. Why doesn't that present a question for the jury? Well, because the only evidence before the trial court, Your Honor, was her testimony of what she was trying to accomplish with the taser, along with a couple of salient facts. Her finger is outside the trigger guard, indicating she doesn't want to use the taser, she doesn't want to fire the taser, she doesn't want to deploy the taser. When the laser is activated is also the second time she's trying to get Mr. Evans' attention. If you recall, before the laser is activated, she actually says to him, hey, I have a taser. I'm going to use it. The testimony is he doesn't stop resisting. He's still struggling with the officers on the ground. She can't get his attention. He's screaming obscenities. So she gets closer to him with the laser light and, excuse me, shines the laser light in his eye briefly and near his eye to get his attention and then says, stop resisting. We have a taser. We're going to use the taser. At that point, he does, in fact, stop resisting. So there is that presumption. We submit to you, Your Honor, that that presumption was met and overcome. And the only evidence in the record before the trial judge is that she doesn't have the requisite mental state, the requisite intent that the Cook case requires. And it's a high burden in Oregon for this battery. As an example, I'd refer the court to the case of Foles v. Safecorp. In that case, to illustrate the double intent required of a battery, an individual approaches another individual from behind, puts him in a bear hug, shakes him. For various reasons, the individual loses the ability to walk momentarily. In analyzing that, the Supreme Court in 1995 in this case says that is not a battery. That is not tortious. Sure, he intended to grab him. He intended to put him in a bear hug. He intended to shake him. But he intended those things, based on the evidence that was in the record at that court, as a greeting. Because he intended that as a greeting, he did not have the intent to harm. That was not a battery. I think that case is illustrative of the high standard. So using the taser, the red light in someone's eye, that's a display of affection, is it? No, no. I don't mean to suggest that. And I don't want to sit here and tell you that Mr. Evans wasn't offended, or that the contact with the laser wasn't offensive to him. I'm sure it was. What the court based its decision on was her intent, Sergeant Gordon's intent in using the laser. Whether an offense happens is not really the point, if the mental state isn't there to begin with. You just said what she based her decision on. But I didn't see any decision on battery by laser, only battery by taser. Can you help me out? Yes, Your Honor. And admittedly, the battery analysis doesn't seem to cover the laser. But in looking at the long argument that was had at the motion for summary judgment, certainly this issue was presented to the court, and the court discussed it at length. There's approximately eight pages of transcript where she's talking about the laser. So I construe her opinion at the motion for summary judgment stage, while it's inartful, to say, okay, there's no cartridge, the finger is outside the trigger guard, it only shined briefly. That all tells me she does not have the intent to commit a battery, whether that battery would be to use the taser as a taser or to commit a battery with the laser light from the taser. That is what I draw from the court's opinion, taking into account that this issue was presented, it was argued to a great extent and in great detail. And certainly the transcript of the argument indicates that the court was concerned about that at that point in time. So seeing that that was present and those facts were present before the court, I construe her inartfully worded opinion to be taking all this into account. And while we're on the subject, you asked previously, Justice Christen, whether the court reached justification. And the court did. On the battery claim. On the battery claim. That's true. The court did not reach justification as a reason for dismissing the battery claim at the summary judgment stage. So why shouldn't we remand this for a ruling on battery by laser and for a finding regarding whether that conduct was justified? Well, if there is no intent to commit a battery either with the taser or the laser, then on de novo review, you can see there's no intent. So then it cannot be a battery as a matter of law. But you also get to uphold the trial court's decision for any basis that you identify in the record. We must remember that this case did proceed and went on to trial on the assault claim. And several other claims as well against other defendants. This case did proceed to trial, and the jury found in favor of Sergeant Gordon on the assault claim. And in its simplest form, an assault is an attempted battery. Viewing the verdict in the light most favorable to the party who received it, it's a battery without the assault when the physical actions of both causes of action are indivisible. The laser being shined in his eye and being told stop resisting, that is one in the same action with the battery. So we now have a case of the jury finding in favor of Sergeant Gordon with all the evidence that was presented at trial saying there is no assault. It's difficult to see how this case can be remanded back to decide the issue of battery when we already know that, at least for the purposes of assault, the intent was not there. And under the Cook case, the intents of assault and battery are the same. We don't really know that the intent wasn't there for the assault claim. What we know from the special verdict form is the jury found no assault. Right. We don't know why they found no assault. We don't know why the jury found assault. But I'd suggest to you that all reasonable inferences drawn from that verdict should be construed in favor of the party who received the verdict. The reasonable inference from the jury's decision as to a finding of not guilty on the assault claim is that there was no intent to commit an assault, especially given these facts and what was presented to the jury. And I see that my time is quickly coming to an end. I want to reserve some time for the city of Portland. But just to conclude, Your Honors, the court down below got it right, and this court should uphold the rulings, both at summary judgment and at trial. Thank you. Albertson. Thank you, and may it please the Court. My name is Harry Auerbach, and I represent Ryan Albertson and the city of Portland. And for the reasons we've stated in the brief, the city and Officer Albertson concur in Multnomah County's arguments about why the judgment should be upheld. I want simply to say that there were a number of claims against a number of parties in this case, and I want to correct at the outset, make sure that there's no confusion about the facts as Mr. Erickson described them. I believe he said there were a number of sheriff's deputies and city police officers involved in the interaction with Mr. Evans. There was one city police officer involved. That was my client, Mr. Albertson, who was not involved until after everybody was on the ground. He was in the jail booking somebody else, and he saw this fight taking place, and he intervened to help try to control Mr. Evans. The jury returned a verdict in favor of Officer Albertson on the plaintiff's excessive force claim against him, and in favor of the city of Portland on the plaintiff's  And nowhere in the briefs or in his argument to this Court has the plaintiff pointed out any way in which any of the five claims that he makes on appeal calls into question the validity of that verdict. So whatever the Court decides about the claims of error that the plaintiff has raised, which, again, we concur with Multnomah County, don't warrant reversal of any part of this judgment. They certainly don't warrant reversal of the judgment as to my clients, Officer Albertson or the city of Portland. If there are you aware of any Oregon cases that involve use of force to take fingerprints? No, Your Honor, I'm not. All I can say in a general proposition is that the police or the sheriffs in this case would have the privilege to use the force that is reasonably necessary to perform their lawful functions, so that if, in fact, Mr. Evans was resisting the efforts to take his fingerprints, they were ---- Well, I mean, I had a case like that once way in the distant past. But you try to take fingerprints of someone who resists, you're not going to get a very good set of fingerprints. That may factually be true. I don't ---- What? That may factually be true. I don't pretend to be an expert on fingerprinting. Secondly, the procedure ought to be that you let the person alone, you don't need to take his fingerprints right away, and you go get a court order. That may be correct. I ---- This whole fracas was over his fingerprints. Well, it was started ---- it may have been started by his refusal to be fingerprinted Once it started, I don't know what their ---- what choice they had about finishing it, though, however. I mean, I don't know if you can just say, well, they should have just not tried to get him under control. In any event, from my perspective, as far as the city and Officer Albertson is concerned, none of that really matters, because there's nothing to challenge the validity of the jury's finding. Well, let me ask the Lord for the calendar. Sure. Mr. Calendaro, have the podium back. Thank you very much. What's the procedure? Does the county have a procedure if they bring someone into the county jail and the person says, I don't want to be fingerprinted? The purpose of the ---- What do they do? Do they put a chokehold on him, or do they beat him up, or what do they do? I guess the answer is they can do a number of things. And I don't mean to suggest here that everything was handled how you and I would like to see it handled. It could have been that if he refuses to put his fingerprints on the property receipt, they put him in a separation cell, let him cool off, and then start the booking process later. That is a possibility. Another thing that perhaps could have worked in hindsight is I believe Mr. Evans didn't know what the process was. He's asking about his guns. Well, his guns aren't at the jail because those guns were taken as evidence. The jail is not holding his guns, and that's why the receipt doesn't say anything about his guns. I don't know that anyone explained that to him. It's not in the record. Perhaps if they had explained, well, the guns are not on this receipt because the guns are simply not here. We do not possess those guns. The guns went to evidence. Then he would have said, okay, and put his fingerprints on the receipt. I agree, Your Honor, that this probably was not handled in the best possible way. Argument here is whether the court made the right decision at the summary judgment stage and at trial, and I submit to you that they did. And unless the Court has any further questions. Did the county have this person's eyes examined by an ophthalmologist? It is not in the record, Your Honor, but I believe he refused treatment at the time, and then when he was sent to the penitentiary, he never got any medical treatment for his eye. There's no medical evidence in the record that his eye was damaged. The only evidence in the record is Mr. Evans' own deposition testimony where he says he sees like a hair in his field of vision, but there was no objective evidence of that. It was just his deposition testimony, and I believe he testified to the jury that same thing, but no medical evidence was presented to the jury at trial either. By either side. By either side. By either side. Correct, Your Honor. Thank you. Thank you, Your Honor. Just referring to what we heard from Apeliz, very quickly in the time I have remaining, there's some discussion over how much time the battery occurred, and I don't think that's relevant because I think in one second, I can hurt someone pretty bad by battery as I could in 15 seconds. The fact of the matter is, Apeliz contends there was a brief battery. That is, the laser of the taser was contacted to the eye at some point. The definition of battery in Oregon, according to the Oregon Court of Appeals from Ballot v. City of Albany, states specifically that battery is defined as a voluntary act. So let's start there. The voluntary act here is Sergeant Gorton. First, she has the taser in her hand, and she says, Stop resisting. He doesn't. Voluntarily, she flicks it on. The laser then shines into his eyes, making an offensive contact, and the battery is committed. As simple as that. The court-based decision that we have been talked about that the county brings up based upon the taser, again, not the laser. The Apeliz would have you believe that there's some implicit decision within the court's written work, although they say it's not the best written work, that it's somewhere there. Perhaps they want to use the term penumbra. I'm not sure, but they say it's in there somewhere, but it's not. They never came to that decision on whether or not the laser, the court, that is, never came to the decision on whether or not the laser actually committed, the use of the laser actually committed a battery, which we contend that it did. Finally, there's some discussion over whether or not the fact that the jury found that there was an assault with respect to the taser affects this issue with the laser. And I point out what the city's attorney said in the court. This is Mr. Landrum says, and I quote. You want to use the microphone? Oh, I'm sorry. Yeah. The Mr. Landrum says, and I quote, this is on excerpt of record, page 264, the standard for battery is arguably lower because the touching has to be offensive. It doesn't have to injure him. It doesn't have to be excessive or unreasonable. It just has to be offensive to him. I can tell you, Your Honor, having been on the opposite side or bad side of a taser for training purposes, that once a laser is on you, it's offensive conduct. And that is exactly how my client felt when the laser was shined into his eye. He was receiving offensive conduct. And was the recipient of offensive conduct. Were you a former police officer? Yes, Your Honor. I should have known that by your haircut. Lastly, Your Honor, excerpt of record, page 345. And as I pointed out to Judge Kristin, in the exhibits from trial, there is a diagram of the laser, the taser itself, the X26, and it will show exactly, it says, laser sight, quote, unquote, pointing to that device. Counsel, you told me exhibit 34 or 35, and now your excerpt of record 345? Yes. Is that just a coincidence? Yes, in both places. I was asked by the court clerk to send in all the original exhibits at the request of the court. That's great. I'll hunt it down. I just want to make sure that I've got the sight correct. It's a much better color picture in the exhibits. Thank you. If there's nothing further, Your Honor. All right. Thank you. Thank you. The matter is submitted. All right.
judges: Goodwin, Pregerson, Christen